UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAUREL ROAD BANK,

                     Plaintiff,

– against –

COMMONBOND, INC.,

                     Defendant.

**OPINION AND ORDER**

18 Civ. 7797 (ER)

Ramos, D.J.:

    Laurel Road Bank brings this action against CommonBond, Inc., alleging that CommonBond infringed its trade dress embodied in an advertising campaign for student loan services. On August 28, 2018, the Court entered a temporary restraining order preventing CommonBond from displaying any new advertisements using the trade dress. On September 14, 2018, following additional briefing and a hearing on Laurel Road's motion for a preliminary injunction, the Court denied the motion and dissolved the temporary restraining order. This Opinion sets forth the Court's reasoning.

**I.    Factual and Procedural Background**

    **A.    The Parties**

    Laurel Road provides financial services in student loan refinancing, mortgages, personal and commercials loans, and consumer and business deposit products. Schaefer Decl. ¶ 3, Doc. 10. Laurel Road has physical bank branches in Connecticut as well as offices in Connecticut, New York, and California. *Id.* ¶ 4. Laurel Road also offers its services online. *Id.* ¶ 25.

CommonBond offers graduate and undergraduate student loans and refinancing of such loans. Phillips Decl. ¶ 3, Doc. 18. CommonBond maintains an office in New York and sells its services nationwide through its online website. *Id.* ¶¶ 4, 12.

**B.     Laurel Road's Trade Dress**

In June 2017, Laurel Road (which was previously known as Darien Rowayton Bank) launched its Laurel Road brand. Schaefer Decl. ¶¶ 3, 15. In connection with the brand launch, Laurel Road developed a "visual identity" or theme that would be used across its website, mobile application, and advertisements. *Id.* ¶¶ 9, 15–19. Laurel Road asserts that this visual identity constitutes a protectable trade dress featuring the following combination of elements (the "Trade Dress"):

> [1] a color palette with a dark background;
>
> [2] a statement in large, light-colored, sans serif font[1] at the top of the advertisement;
>
> [3] a "hierarchal" typography with smaller, sans serif font under the large typeface sentences;
>
> [4] center or left-side alignment; and
>
> [5] a colored line under a subset of words in the large typeface sentences.[2]

Compl. ¶ 25, Doc. 1. Laurel Road's claimed Trade Dress is not a federally registered trademark.

Laurel Road submitted numerous advertisements that allegedly embody its Trade Dress and were published in early or mid-2018. For example, the following advertisement ran in print outlets in May and June 2018:

---

[1] A sans serif font is a typeface with no serifs, which are "short lines stemming from and at an angle to the upper and lower ends of the strokes of a letter." *Serif*, Merriam-Webster, https://www.merriam-webster.com/dictionary/serif (last visited Mar. 5, 2019).

[2] Laurel Road refers to this fifth element as the "path," and it resembles the colored line between "laurel" and "road" in the company's logo. Compl. ¶ 25.



Schaefer Decl. Ex. 2.[3]  In addition, beginning in March 2018, Laurel Road placed at least two billboard advertisements with a similar visual style, although the background is a darker blue, as shown below:

---

[3] At oral argument, CommonBond objected to the admissibility of this advertisement because it omitted the text corresponding to a footnote indicated in the third line after "$20,000." Oral Arg. Tr. 32:6–33:8, Doc. 57.  Under the rule of completeness, "the omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Castro*, 813 F.2d 571, 575–76 (2d Cir. 1987).  However, if an incomplete statement "conveys the substance and context of the statement as a whole, it does not offend the rule of completeness." *United States v. Mussaleen*, 35 F.3d 692, 696 (2d Cir. 1994).  Here, the Court concludes that the exhibit conveys enough of the advertisement that the omission of the footnote text does not render it inadmissible.  (After oral argument, Laurel Road submitted the complete advertisement with the footnote text, which ran underneath the ad and comprised small gray-colored text concerning calculation of the $20,000 figure and information on the company, as well as two logos, on a white background.  Doc. 33.)



*Id.* ¶ 18 & Ex. 6; *see also id.* Ex. 5. Laurel Road proffered a mockup of a third billboard, but it had not yet run publicly. *Id.* Ex. 4. Beginning in March 2018, Laurel Road also ran numerous print and poster advertisements that evoked the visual theme, but with the difference that the background consisted mainly of a photograph of a person, with a banner of dark blue only at the bottom. *Id.* ¶ 18 & Exs. 3, 7–16.

Laurel Road claims that it has spent over $7 million nationwide on advertisements and promotion using the Trade Dress. *Id.* ¶¶ 17, 21. This includes over $1.8 million in advertising in the New York City metropolitan area, including advertisements in New York City subway cars and stations, Long Island Railroad and Metro-North train cars, parking garages, and billboards over highways, as well as nearly $400,000 in online advertisements. *Id.* ¶¶ 18–19.

### C. CommonBond's Metro-North Advertisement

On August 14, 2018, a Laurel Road employee encountered the following CommonBond advertisement in a Metro-North train car:

 

*Id.* Ex. 20; Phillips Decl. Ex. G.[4]  The advertisement shares several features with certain Laurel Road ads, namely, the blue background, white sans serif font, hierarchal and left-aligned text, and light-colored underlining on part of the large text—CommonBond's underlining is pink, while Laurel Road's is yellow with white endpoints.  Laurel Road claims that its employee was confused into believing that it may have sponsored or authorized the CommonBond advertisement, given the visual similarities as well as the fact that both companies offer student

---

[4] CommonBond claims that Laurel Road's submission (depicted on the left) does not accurately portray the color of the advertisement.  Phillips Decl. ¶ 17.  CommonBond asserts that the true color of the advertisement is a lighter blue and is solid rather than a gradient.  *Id.*  CommonBond has submitted what it claims is a true and correct version of the advertisement (depicted on the right).  *Id.* ¶ 14.

loan services and advertise in Metro-North train cars. Schaefer Decl. ¶¶ 30–31. Laurel Road states that CommonBond's advertisement was a marked departure from its previous advertising campaign, which featured cartoon figures with bright colors against a light blue sky, and text without any colored underlining. *Id.* Exs. 17–19.

### D. Procedural and Factual Developments

On August 27, 2018, Laurel Road filed its Complaint against CommonBond, asserting claims for infringement and dilution of its Trade Dress and unfair competition under the Lanham Act and New York statutory or common law, as well as unjust enrichment. Compl. ¶¶ 49–96. The next day, pursuant to Federal Rule of Civil Procedure 65, Laurel Road requested a temporary restraining order ("TRO") enjoining CommonBond from using the Trade Dress in any advertising pending the outcome of its motion for a preliminary injunction. The Court held a hearing on the request, which counsel for both parties attended.

Based on Laurel Road's submissions and counsel's arguments, the Court entered a TRO enjoining CommonBond from displaying any new advertisements using the Trade Dress until the preliminary injunction hearing. Doc. 9, at 2. The parties fully briefed the preliminary injunction motion, and oral argument was held on September 14, 2018.

CommonBond adduced significant evidence between the TRO and preliminary injunction hearings. First, CommonBond showed that the Metro-North advertisement at issue was one of four posters that were placed throughout a train car as a set. Phillips Decl. ¶ 14 & Ex. F. One of the other posters had a light pink background, and the remaining two had a white background, a cartoon illustration, and no colored underlining. *Id.* ¶ 15 & Ex. G.

CommonBond also submitted advertisements that it used as early as 2017—months before Laurel Road published its advertisements—that incorporated many of the elements of the Trade Dress. For instance, in June 2017, CommonBond ran animated website ads consisting of

6

five vertical or square frames, the last of which featured a dark blue background, white and light blue sans serif font, hierarchal and center-aligned text, and light blue underlining on certain text representing a hyperlink. The final frame in vertical format is depicted below:



Phillips Supp. Decl. Ex. A., Doc. 27. In August 2017, CommonBond used the following advertisement featuring a dark blue background, white and light blue sans serif font, left-aligned text, and light blue underlining at the end of the text:

> Give your employees the student loan benefits they want.

Phillips Decl. Ex. C. Another CommonBond advertisement in May 2017 featured a black background, white sans serif font, center-aligned text, and a yellow line under the final line of text. *Id.* Exs. B, C.

In addition, CommonBond submitted numerous advertisements of other companies in various industries that incorporate many of the elements of the Trade Dress. *Id.* Ex. K. Of these exhibits, no one advertisement includes all the elements of the Trade Dress, but many incorporate several elements, and collectively they touch upon every element.

On September 14, 2018, at the conclusion of the preliminary injunction hearing, the Court denied Laurel Road's motion for a preliminary injunction and dissolved the TRO. The following business day, the Court issued an Order memorializing its decision and stating that an Opinion would follow. Doc. 28. This is that Opinion.

## II. Legal Standard

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to

suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

### III. Discussion

"The concept of trade dress encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997). Trade dress may include "the appearance of labels, wrappers, and containers used in packaging a product as well as displays and other materials used in presenting the product to prospective purchasers." *Id.* (quoting Restatement (Third) of Unfair Competition § 16 cmt. a (Am. Law Inst. 1995)). "Elements comprising a product's trade dress may include features such as size, shape, color combinations, texture, graphics, or . . . particular sales techniques," as well as "words, symbols, collections of colors and designs, or advertising materials or techniques that the purchasing public has come to associate with a single source." *Dana Braun, Inc. v. SML Sport Ltd.*, No. 03 Civ. 6405 (BSJ), 2003 WL 22832265, at *11 (S.D.N.Y. Nov. 25, 2003) (quoting *Harlequin Enters. Ltd. v. Gulf & W. Corp.*, 503 F. Supp. 647, 649 (S.D.N.Y. 1980), *aff'd*, 644 F.2d 946 (2d Cir. 1981)).

To prevail on a claim for trade dress infringement, the plaintiff must show that (1) the "trade dress is valid and entitled to protection," and (2) the "defendant's use of the . . . trade dress is likely to cause consumer confusion as to the origin, affiliation or association, or endorsement of defendant's goods or services." *Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*, No. 15 Civ. 1092 (JMF), 2015 WL 845711, at *3 (S.D.N.Y. Feb. 26, 2015).[5]

---

[5] Whether assessing an unregistered trade dress or a registered trademark, "the infringement analysis is the same." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216 n.9 (2d

9

To assert a valid trade dress, the plaintiff must "demonstrate that its trade dress is *either* inherently distinctive *or* that it has acquired distinctiveness through a secondary meaning." *Fun-Damental*, 111 F.3d at 999. In addition, the plaintiff must "prove that an unregistered trade dress is 'not functional.'" *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116 (2d Cir. 2001) (quoting 15 U.S.C. § 1125(a)(3)).

A. **Distinctiveness**

A trade dress's distinctiveness is evaluated on a spectrum and is classified as "generic, descriptive, suggestive, or arbitrary/fanciful." *Fun-Damental*, 111 F.3d at 1000. "Suggestive and arbitrary or fanciful trade dress are deemed inherently distinctive and thus always satisfy the first prong of the test for protection. A descriptive trade dress may be found inherently distinctive if the plaintiff establishes that its mark has acquired secondary meaning giving it distinctiveness to the consumer. A generic trade dress receives no Lanham Act protection." *Id.* (citations omitted).

"Since the choices that a producer has for packaging its products are . . . almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive . . . ." *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 583 (2d Cir. 1993). However, a trade dress that directly conveys information about the product or service is descriptive. For example, an advertisement featuring four boxes containing the labels "north," "south," "east," and "west," followed by contact information for branches in those geographic areas in a city, is "descriptive of the company's ability to service the entire city." *Id.* at 584 (citing *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609 (7th Cir. 1986)). Moreover, "where it is

---

Cir. 2012). Further, "[t]he elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law mirror the Lanham Act claims." *ESPN, Inc. v. Quiksilver, Inc.*, 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008).

the custom of an industry to package products in a particular manner, a trade dress in that style would be generic and therefore not inherently distinctive." *Id.* at 583. For example, "packaging lime-flavored soda in green twelve-ounce cans is so common in the soft drink industry" as to render the packaging generic. *Id.*

"[T]he focus of the distinctiveness inquiry" is on "the combination of elements" that make up the trade dress. *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995). "Thus, if the overall dress is arbitrary, fanciful, or suggestive, it is distinctive despite its incorporation of generic elements." *Id.* "Nonetheless, the fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or 'generic,' to avoid tying up a product or marketing idea." *Id.* Indeed, "just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance." *Id.* "The level of generality at which a trade dress is described, as well as the fact that a similar trade dress is already being used by manufacturers of other kinds of products, may indicate that that dress is no more than a concept or idea to be applied to particular products." *Id.* at 33.

Here, Laurel Road's Trade Dress is defined as "[1] a color palette with a dark background; [2] a statement in large, light-colored, sans serif font at the top of the advertisement; [3] a 'hierarchal' typography with smaller, sans serif font under the large typeface sentences; [4] center or left-side alignment; and [5] a colored line under a subset of words in the large typeface sentences." Compl. ¶ 25. At the outset, many of the elements of the Trade Dress are defined at a high level of generality, such as a "dark background"; "light-colored, sans serif font"; and "colored line"—without specifying the actual colors or fonts. Furthermore, CommonBond has shown that all the elements can be readily found in other advertisements, with several elements

11

often appearing in combination. *See* Phillips Decl. Ex. K. And significantly, CommonBond has shown that its own advertisements, prior to Laurel Road's advertisements featuring the Trade Dress,[6] have used *all or nearly all* the elements in combination.[7] *See* Phillips Supp. Decl. Ex. A ((1) dark blue background; (2) large, white, sans serif font at the top; (3) hierarchal typography with smaller, sans serif font under the large typeface; (4) center alignment; and (5) light blue line under a subset of words in one of the large typefaces); *see also* Phillips Decl. Exs. B, C ((1) dark blue or black background; (2) large, white or light blue, sans serif font; (4) left-side or center alignment; and (5) light blue or yellow line under a subset of words in the large typeface; but missing the third element of hierarchal typography). Because the Trade Dress is composed exclusively of commonly used elements, which have all been used in combination previously, the Trade Dress is likely generic, and Laurel Road is not likely to show that its Trade Dress is distinctive. *See Conte v. Newsday, Inc.*, No. 06 Civ. 4859 (JFB) (ETB), 2013 WL 978711, at *17–19 (E.D.N.Y. Mar. 13, 2013) (holding that a magazine's trade dress consisting of a "gloss paper cover," "fonts and font sizes . . . in the title header," and the "design, shape, lettering font and font sizes, and tri-color three part layout and appearance of the . . . advertising footer" was

---

[6] Laurel Road asserts that it began using its Trade Dress in June 2017. Schaefer Decl. ¶ 15. However, the earliest advertisements featuring the Trade Dress that Laurel Road has actually proffered are from March 2018. *Id.* ¶ 18 & Exs. 5–16. CommonBond has proffered advertisements incorporating all or nearly all the Trade Dress elements that it published in May, June, and August 2017. Phillips Supp. Decl. Ex. A; Phillips Decl. Ex. C. Accordingly, the Court finds that CommonBond's advertisements using these elements were published first.

[7] At oral argument, CommonBond suggested that, "if anything, they'd be stealing our trade dress, not the other way around." Oral Arg. Tr. 37:5–6. However, CommonBond does not argue that it has priority in use of the Trade Dress, assuming it were protectable, *see* Def.'s Opp'n, Doc. 20, possibly because it has not shown that it has consistently used the Trade Dress, Oral Arg. Tr. 54:14–55:3. *See generally Excelled Sheepskin & Leather Coat Corp. v. Or. Brewing Co.*, 897 F.3d 413, 418 (2d Cir. 2018) ("To prove bona fide usage, the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory . . . ." (quoting *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271–72 (2d Cir. 1974))). Accordingly, the Court construes CommonBond's argument concerning its own prior use of elements of the Trade Dress as relevant to whether the Trade Dress is generic.

generic because it was "composed exclusively of commonly used, non-unique, and functional elements" and "effectively an unprotectable idea or concept").[8]

Because the Trade Dress likely is generic and receives no protection, the Court need not assess whether it has secondary meaning. *See Jeffrey Milstein*, 58 F.3d at 34 ("Since the features of [plaintiff]'s trade dress for which it seeks protection can be considered 'generic,' even a showing of secondary meaning could not make that dress 'distinctive.'").

## B. Functionality

"The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 164 (1995). "[A] product feature is considered to be 'functional' in a utilitarian sense if it is (1) 'essential to the use or purpose of the article,' or if it (2) 'affects the cost or quality of the article.'"[9] *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 219 (2d Cir. 2012) (footnote omitted) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844,

---

[8] Laurel Road attempts to distinguish *Conte* on the grounds that the magazine's trade dress, which appeared as a glossy cover of an ad-supported magazine, "simply 'refer[red] to the genus of which the particular product is a species,'" rendering it generic. *Conte*, 2013 WL 978711, at *19 (quoting *Jeffrey Milstein*, 58 F.3d at 33). Laurel Road contends that its Trade Dress, even if used in other markets, does not identify the "genus" of student loans. Pl.'s Reply 4 n.3, Doc. 24. However, "the fact that a similar trade dress is already being used by manufacturers of *other kinds of products*[] may indicate that that dress is no more than a concept or idea to be applied to particular products." *Jeffrey Milstein*, 58 F.3d at 33 (emphasis added). Thus, common usage of the Trade Dress's elements in other industries bears on whether it is generic. *See* Phillips Decl. Ex. K. In any event, CommonBond has used all or nearly all the elements in advertisements for the very type of product at issue—student loan services. *See* Phillips Supp. Decl. Ex. A; Phillips Decl. Exs. B, C.

[9] If a design feature does not have utilitarian functionality, a court may also consider whether it has "aesthetic functionality." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 220 (2d Cir. 2012). A mark is aesthetically functional if "protection of the mark *significantly* undermines competitors' ability to compete in the relevant market," which is assessed by "carefully weigh[ing] 'the competitive benefits of protecting the source-identifying aspects' of a mark against the 'competitive costs of precluding competitors from using the feature.'" *Id.* at 222 (quoting *Fabrication Enters., Inc. v. Hygenic Corp.*, 64 F.3d 53, 59 (2d Cir. 1995)).

850 n.10 (1982)). "A feature is essential 'if [it] is dictated by the functions to be performed' by the article." *Id.* (alteration in original) (quoting *LeSportsac, Inc. v. K mart Corp.*, 754 F.2d 71, 76 (2d Cir. 1985)). A feature affects cost or quality if it "'permits the article to be manufactured at a lower cost' or 'constitutes an improvement in the operation of the goods.'" *Id.* (quoting *LeSportsac*, 754 F.2d at 76). In assessing functionality, a court should examine "(1) the degree of functionality of the similar features of the product, (2) the degree of similarity between the non-functional (ornamental) features of the competing products, and (3) the feasibility of alternative designs that would not impair the utility of the product." *Fabrication Enters., Inc. v. Hygenic Corp.*, 64 F.3d 53, 59 (2d Cir. 1995).

As with distinctiveness, the functionality inquiry is focused on "the particular combination and arrangement of design elements," rather than the individual elements. *LeSportsac*, 754 F.2d at 76. However, "unique arrangements of purely functional features constitute a functional design." *Fabrication Enters.*, 64 F.3d at 59 (quoting *Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 977 (2d Cir. 1987)); *see also Jeffrey Milstein*, 58 F.3d at 32 ("[T]he fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or 'generic,' to avoid tying up a product or marketing idea.").

At the outset, the parties dispute what the relevant object of a utilitarian function is in this case. CommonBond contends that the Trade Dress is functional if it is essential to or affects the effectiveness of *advertising*. Def.'s Opp'n 15–17, Doc. 20. Laurel Road, by contrast, argues that the Trade Dress is functional if it is useful for *student loan services*. Pl.'s Reply 2–3, Doc. 24. The distinction is largely beside the point, because a feature that is useful to advertising will also be useful to consumers of student loan services by educating them about the product. *Cf.*

14

*Original Appalachian Artworks, Inc. v. Blue Box Factory (USA) Ltd.*, 577 F. Supp. 625, 631 (S.D.N.Y. 1983) (holding that a plastic window on boxes in which dolls were sold was functional because it displayed the product to consumers). Accordingly, the usefulness of features to the advertisements on which they appear is a proper analytical lens.

Laurel Road's Trade Dress is composed exclusively of functional elements. The first two elements of a "light-colored . . . font" over a "dark background" in tandem are functional because contrasting colors facilitate the text's readability. *Cf. ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1289 (Fed. Cir. 2010) (holding that the color blue for endoscopic probes was functional because its contrast with human tissue made the probe more visible through an endoscopic camera). Moreover, Laurel Road has defined these elements at a high level of generality, choosing a "light-colored . . . font" and "dark background" rather than specific colors. This severely curtails "the feasibility of alternative designs" with similar readability, *Fabrication Enters.*, 64 F.3d at 59—which are limited to dark fonts on light backgrounds, cutting the range of available color combinations in half, Phillips Decl. ¶ 22—and reinforces the highly functional nature of these elements.

Similarly, the "sans serif font" in the second and third element is functional because plain typefaces have enhanced legibility and readability. *Id.* ¶ 21. And again, alternative designs are limited because the Trade Dress encompasses any sans serif font rather than a particular typeface.

The "hierarchal" typography of a large font above a smaller font as described in the third element is also functional. Large text catches a viewer's attention, and its position at the top matches how one would read the advertisement from top to bottom. *Cf. Chelo Pub. Inc. v. Focus Pub. Ltd.*, No. 94 Civ. 0123 (CSH), 1994 WL 391668, at *3 (S.D.N.Y. July 28, 1994) (holding

that "placing the title of the magazine in a bold, easily visible typeface at the top of the cover" was functional because it ensured that the title would be visible in newsstands).

Likewise, the fourth element of "center or left-side alignment" is functional. Center alignment puts the text at the forefront of one's view of an advertisement, and left-side alignment matches the left-to-right direction for reading English.

Finally, the "colored line under a subset of words" in the fifth element is functional because underlining words provides emphasis. Phillips Decl. ¶ 21. In addition, the Trade Dress does not specify any particular color for the line, limiting alternative designs.

To be sure, the ultimate inquiry is whether "the particular combination and arrangement of design elements," rather than the individual elements, is functional. *LeSportsac*, 754 F.2d at 76. However, "where the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional." *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1013 (9th Cir. 1999). Moreover, because the Trade Dress is unregistered, it is Laurel Road's burden to prove that the combination of elements is not functional. *See* 15 U.S.C. § 1125(a)(3). Under these circumstances, where each element is functional and the elements work in tandem to create an advertisement that is readable and eye-catching, Laurel Road is not likely to meet its burden that the Trade Dress is nonfunctional.

As the Trade Dress is likely invalid because it is functional and generic, the Court need not address the likelihood of consumer confusion. *See Jeffrey Milstein*, 58 F.3d at 34 (stating that a court may deny injunctive relief where the trade dress is unprotectable without considering the likelihood of confusion).

## IV. Conclusion

Because Laurel Road has failed to show a likelihood of success, its motion for a preliminary injunction is DENIED.[10]

It is SO ORDERED.

Dated: March 5, 2019
New York, New York

Edgardo Ramos, U.S.D.J.

---

[10] An injunction also would not be in the public interest, because it would effectively grant Laurel Road a monopoly over commonly used and functional elements of advertising. *See Jeffrey Milstein*, 58 F.3d at 32.